IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Erick C. Carter, et al., | Lead Case No. 3:05 CV 7427 |
| | Consolidated Case No. 3:09 CV 400 |
| Plaintiffs, | |
| | MEMORANDUM OPINION |
| -vs- | AND ORDER |
| | |
| Welles-Bowen Realty, Inc., et al., | JUDGE JACK ZOUHARY |
| | |
| Defendants, | |
| and | |
| Joshua J. Grzecki, | |
| Plaintiff, | |
| -vs- | |
| The Danberry Co., et al., | |
| Defendants. | |

**INTRODUCTION**

These two consolidated cases are before the Court on Defendant Chicago Title's Motion for Summary Judgment (Doc. Nos. 119).[1] Plaintiffs purchased title insurance services from Defendants Welles Bowen Title Agency ("WB Title") and Integrity Title Agency of Ohio & Michigan, Ltd ("Integrity Title"). Plaintiffs claim those services were rendered in violation of the Real Estate

---

[1] The other Defendants filed a joint Motion for Summary Judgment (Case 09-CV-400, Doc. No. 52). The arguments advanced in the joint Motion are similar, but not identical, to the arguments advanced in Chicago Title's Motion. The oral argument focused on Chicago Title's Motion, and this Court will do the same here. Given that Plaintiffs' allegations are directed to the business relationships among all the Defendants, the disposition of Chicago Title's Motion will apply to the other Defendants as well.

Settlement Practices Act ("RESPA"), 12 U.S.C. §§ 2601-2617, and they seek treble damages pursuant to 12 U.S.C. § 2607(d)(2), plus attorneys' fees. The matter has been briefed (Doc. Nos. 119, 169, 174, 189), and the Court held a hearing on May 27, 2010 (Doc. No. 187). The Court previously denied Plaintiffs' Motions for Class Certification (Doc. No. 156).

## BACKGROUND

Plaintiffs allege Defendant Chicago Title Insurance Company ("Chicago Title") collaborated with two real estate firms to create two sham title companies. Case 05-CV-7427 involves Plaintiffs Erick and Whitney Carter, who purchased title insurance services from WB Title in 2005. WB Title was formed by Defendants Chicago Title and Welles Bowen Realty ("WB Realty"). Case 09-CV-400 involves Plaintiff Joshua Grzecki, who purchased title insurance services from Integrity Title in 2008. Integrity Title was formed by Defendants Chicago Title and the Danberry Co. ("Danberry"). Chicago Title owns 50.1% of both WB Title and Integrity Title; WB Realty and Danberry (through their subsidiaries) own the remaining 49.9% of each entity, respectively. WB Title and Integrity Title are known as affiliated business arrangements ("ABAs") -- a term specifically defined by RESPA.

Plaintiffs allege agents for the real estate firms are encouraged to refer their clients to WB Title and Integrity Title, which receive more than 90% of their work from those referrals. According to Plaintiffs, WB Title and Integrity Title provide few substantive services themselves; rather, they contract out the bulk of their work to Chicago Title. In Plaintiffs' view, WB Title and Integrity Title were created so Chicago Title would capture title insurance work in the Toledo, Ohio area, and so WB Realty and Danberry would share in the title insurance profits. Plaintiffs claim that WB Title and Integrity Title are sham companies that were set up to be conduits for kickbacks from Chicago Title. Plaintiffs believe such arrangements violate RESPA.

In the specific transactions at issue in these cases, Chicago Title performed the title searches. WB Title and Integrity Title then evaluated the title evidence to determine insurability, issued title commitments, and issued final title insurance policies (Kost Decl., ¶ 47; Nosker Decl., ¶ 44). When Plaintiffs purchased title insurance from Defendants, Plaintiffs were provided with disclosures of Defendants' ownership arrangement on forms promulgated by the Department of Housing and Urban Development ("HUD") (Carter Dep., p. 89; Grzecki Dep., p. 50-51). Plaintiffs were not required to use any particular title insurance agency (Carter Dep., p. 90, Def. App'x, p. 92). The only thing of value that the owners of WB Title and Integrity Title received was a return on their ownership interest (Kost Decl., ¶ 25; Nosker Decl., ¶ 23).

Plaintiffs do not allege they received subpar title insurance services or were overcharged for those services. However, RESPA allows recovery of treble damages by consumers who are charged for any settlement service rendered in violation of the anti-kickback provision. 12 U.S.C.A. § 2607(d)(2); *see also In re Carter*, 553 F.3d 979, 989 (6th Cir. 2009) (holding that plaintiffs need not allege a concrete injury to sue under RESPA's anti-kickback provision).

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains

3

sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## DISCUSSION

**RESPA's Prohibition Against Kickbacks and Unearned Fees**

RESPA's anti-kickback provision contains two broad prohibitions:

(a) Business referrals

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(a)-(b). However, RESPA explicitly provides five exceptions from these prohibitions. Defendants invoke two of those exceptions (subsections (c)(2) and (c)(4)) here:

(c) Fees, salaries, compensation, or other payments

Nothing in this section shall be construed as prohibiting . . .

(2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed, . . . [or]

(4) affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such a referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred[,] . . . (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship . . . [.]"

4

**Exception for "Services Actually Performed"**

Defendants first invoke the Section 2607(c)(2) exception for "services actually performed." Defendants claim it is undisputed that WB Title and Integrity Title received fees for actual services -- namely, they evaluated title evidence to determine insurability, issued title commitments, cleared underwriting objections, and issued final title insurance policies. But even if true, that argument ignores the thrust of Plaintiffs' Complaint, which is that part of those fees were passed on to WB Realty and Danberry in the form of kickbacks. Thus, the question is whether WB Realty *and* Danberry (*not* WB Title and Integrity Title) received fees for "services actually performed." Defendants do not argue that they do. Defendants cite no cases suggesting that simply because one entity performed some services, all affiliated entities can take advantage of the Section 2607(c)(2) exception. The one case cited by Defendants in support of their Section 2607(c)(2) argument did not involve an ABA; rather, it involved whether an appraiser selected by a mortgage lender was paid for "services actually performed." *Cedeno v. IndyMac Bancorp, Inc.*, No. 06 Civ. 6438, 2008 WL 3992304, at *3-4 (S.D.N.Y. Aug. 26, 2008). Of course, Defendants contend that WB Realty and Danberry received only their share of the profits of WB Title and Integrity Title, and not any kickbacks. But that is an argument for applying the ABA exception in Section 2607(c)(4) (addressed below). In sum, Defendants cannot take advantage of the Section 2607(c)(2) exception for "services actually performed."

**Exception for ABAs**

Defendants also claim they are entitled to judgment under the Section 2607(c)(4) exception for ABAs. Defendants claim it is undisputed that WB Title and Integrity Title meet the three requirements for that exception: (1) disclosure of the ownership arrangement, (2) the consumers were not required to use a particular provider, and (3) the ABAs compensated their owners based purely

5

on ownership interest. 12 U.S.C. § 2607(c)(4). Plaintiffs contend the statute does not tell the whole story. In order to take advantage of the Section 2607(c)(4) exception, argue Plaintiffs, an ABA must first be a "bona fide provider of settlement services." That determination is made, according to Plaintiffs, by applying the ten-factor test in HUD Policy Statement 1996-2 ("Policy Statement"), 61 Fed. Reg. 29,258, 20 C.F.R. Pt. 3500. The Policy Statement aims to distinguish between "sham" ABAs that are "mere conduits for kickbacks" and ABAs that are bona fide providers. *Id.* The Policy Statement explains that no one factor is determinative; rather, the ten factors "will be considered together in determining whether the entity is a bona fide settlement service provider." 61 Fed. Reg. at 29,262. The ten factors are as follows (*id.*):

> (1) Does the new entity have sufficient initial capital and net worth, typical in the industry, to conduct the settlement service business for which it was created? Or is it undercapitalized to do the work it purports to provide?
>
> (2) Is the new entity staffed with its own employees to perform the services it provides? Or does the new entity have "loaned" employees of one of the parent providers?
>
> (3) Does the new entity manage its own business affairs? Or is an entity that helped create the new entity running the new entity for the parent provider making the referrals?
>
> (4) Does the new entity have an office for business which is separate from one of the parent providers? If the new entity is located at the same business address as one of the parent providers, does the new entity pay a general market value rent for the facilities actually furnished?
>
> (5) Is the new entity providing substantial services, i.e., the essential functions of the real estate settlement service, for which the entity receives a fee? Does it incur the risks and receive the rewards of any comparable enterprise operating in the market place?
>
> (6) Does the new entity perform all of the substantial services itself? Or does it contract out part of the work? If so, how much of the work is contracted out?

6

(7) If the new entity contracts out some of its essential functions, does it contract services from an independent third party? Or are the services contracted from a parent, affiliated provider or an entity that helped create the controlled entity? If the new entity contracts out work to a parent, affiliated provider or an entity that helped create it, does the new entity provide any functions that are of value to the settlement process?

(8) If the new entity contracts out work to another party, is the party performing any contracted services receiving a payment for services or facilities provided that bears a reasonable relationship to the value of the services or goods received? Or is the contractor providing services or goods at a charge such that the new entity is receiving a "thing of value" for referring settlement service business to the party performing the service?

(9) Is the new entity actively competing in the market place for business? Does the new entity receive or attempt to obtain business from settlement service providers other than one of the settlement service providers that created the new entity?

(10) Is the new entity sending business exclusively to one of the settlement service providers that created it (such as the title application for a title policy to a title insurance underwriter or a loan package to a lender)? Or does the new entity send business to a number of entities, which may include one of the providers that created it?

Defendants argue the Policy Statement should carry no force, for two reasons. First, Defendants argue the Policy Statement deserves no deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), as it is contrary to the plain terms of the Section 2607(c)(4) exception; because that exception sets forth three -- and only three -- conditions in plain terms, HUD had no warrant to fashion a test that essentially adds ten new requirements to the statute. Second, Defendants argue the ten-factor test is unconstitutionally vague.

*Vagueness*

This Court will first address Defendants' latter argument that HUD's ten-factor test for distinguishing "sham" and "bona fide" providers is unconstitutionally vague. This Court is "obliged to construe the statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress." *Chamber of Commerce of U.S. v. Fed. Election Comm'n*, 69 F.3d 600, 605

7

(D.C. Cir. 1995). "This canon of constitutional avoidance trumps *Chevron* deference . . . and [a court] will not submit to an agency's interpretation of a statute if it presents serious constitutional difficulties." *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Dir. 2008) (internal quotation and citation omitted). This Court concludes that the ten-factor HUD test raises serious constitutional difficulties.

The void-for-vagueness doctrine, grounded in the Due Process Clauses of the Fifth and Fourteenth Amendments, requires that a law or regulation (1) define prohibited conduct "with sufficient definiteness that ordinary people can understand" what is prohibited, and (2) establish standards permitting authorities "to enforce the law in a non-arbitrary, non-discriminatory manner." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Courts employ various levels of strictness in analyzing vagueness challenges, depending on the type of conduct regulated and the potential consequences of violations. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). Laws deserve closer scrutiny when they reach conduct protected by the First Amendment, or when they impose criminal penalties. *Belle Maer*, 170 F.3d at 557. In this case, although Plaintiffs bring a private civil enforcement action, violations of RESPA can result in criminal sanctions. 12 U.S.C. § 2607(d)(1) ("Any person or persons who violate the provisions of this section shall be fined not more than $10,000 or imprisoned for not more than one year, or both."). Moreover, a statute must be given the same construction in its civil and criminal applications. *See Fed. Commc'ns Comm'n v. Am. Broad. Corp.*, 347 U.S. 284, 296 ("[T]hese are not criminal cases, but it is a criminal statute that we must interpret. There cannot be one construction for the Federal Communications Commission and another for the Department of Justice."); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229,

8

255 (1989) (Scalia, J., concurring) ("RICO, since it has criminal applications as well, must, even in its civil applications, possess the degree of certainty required for criminal laws[.]").[2]

Accordingly, because RESPA imposes potential criminal sanctions, "a relatively strict [vagueness] test is warranted." *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1993). This Court must examine the Policy Statement "on its face to determine whether it lacks sufficient definiteness to meet the requirements of the Due Process Clause." *Belle Maer*, 170 F.3d at 553.[3] *Belle Maer* involved a local ordinance that regulated the operation of bubbler systems that kept ice off of harbors in the winter. The ordinance provided that the open-water area "could not exceed a five-foot radius . . . or an area 'determined by the inspecting officer to be a reasonable radius.'" *Id.* at 555 (quoting the local ordinance at issue). The court held that the "reasonableness" language rendered the ordinance unconstitutionally vague, because "neither the enforcement officer nor the bubbler operator can ascertain by examining the language of the Ordinance alone whether criminal sanctions will result from one foot or ten feet of open water." *Id.* at 559. Further, the court rejected the defendant's argument that enforcement decisions would be constrained by the stated

---

[2] Plaintiffs' counsel struggled at the hearing to address the issue of potential criminal liability, alternatively suggesting one standard for civil liability and another for criminal prosecution, or using the ten-factor test to prove scienter or as a good faith defense (TR 21-23).

[3] An unpublished Sixth Circuit decision indicates that outside the First Amendment context, a criminal statute or regulation cannot be challenged as overly vague on its face; rather, the vagueness analysis should be limited to whether the statute is vague as applied to the particular facts of the case. *Condon v. Wolfe*, 310 F. App'x 807, 821 (6th Cir. 2009). However, the *Condon* approach is at odds with *Belle Maer*, which employed a facial analysis. 170 F.3d at 553. The Supreme Court has sent mixed messages on the issue. *Compare Hoffman Estates*, 455 U.S. at 497 ("[T]he complainant must demonstrate that the law is impermissibly vague in all of its applications.") *with Kolender v. Lawson*, 461 U.S. 352, 358, n.8 (1983) ("[W]here a statute imposes criminal penalties, the standard of certainty is higher, [and] [t]his concern has, at times, led us to invalidate a criminal statute on its face even when it could conceivably have had some valid application.") (citation omitted). In any event, this Court is bound to follow the approach of the Sixth Circuit's published decision in *Belle Maer*.

9

purpose of the statute, which was to protect the health and safety of local residents. *Id.* Reference to the ordinance's purpose could not cure the vagueness of the "reasonableness" language. *Id.*

HUD's ten-factor test suffers from similar infirmities. First, half of the factors use vague terms reminiscent of the "reasonableness" language struck down in *Belle Maer*. The first factor asks whether the ABA has "sufficient" operating capital and net worth; the fifth and sixth factors ask whether the entity performs "substantial" services; the seventh factor asks whether the entity is paying "reasonable" rates for services contracted out to other entities; and the ninth factor asks whether the entity "actively competes" in the marketplace. All of these factors invite a highly subjective evaluation. The Policy Statement gives no guidance as to what level of capital would be deemed "sufficient," how many services must be performed to be deemed "substantial," what "reasonable" rates are, or what an entity must do to "actively compete."

The vagueness of the individual factors is compounded by the subjective balancing process inherent in the test. HUD explains that the ten factors "will be considered together in determining whether the entity is a bona fide settlement service provider." But HUD gives no indication how many factors might be determinative, or which factors might weigh more heavily in the analysis. Any entity wishing to operate as an ABA (an arrangement RESPA specifically condones, with certain limitations) is thus confronted with a massive gray area. At some point within that gray area, both civil and criminal liability might attach. But the test gives no indication of where that point might be. Thus, the regulation does not contain "sufficient exactness to prevent arbitrary enforcement and give notice of what an individual must do to comply with the enactment." *Belle Maer*, 170 F.3d at 559.

The instant cases present examples of the necessarily murky application of the ten-factor test. Counsel for both sides agree that the underlying material facts are not in dispute (TR 45-47), but the application of the test to those facts is fuzzy at best. For example, it is undisputed that WB Title and

10

Integrity Title had initial capitalizations of $36,000 and $30,000, respectively (Kost Decl., ¶ 15; Nosker Decl., ¶ 9). But would those numbers represent "sufficient" operating capital? The regulation does not give this Court, the parties, or a potential jury any standard for answering this question. Likewise, it is undisputed that WB Title and Integrity Title provided some settlement services: they evaluated title evidence to determine insurability, issued title commitments, cleared underwriting objections, and issued title insurance policies, even though they did not perform the underlying title searches (Chicago Title did). Are such services "substantial"? Again, the Policy Statement offers no standard for judging an imprecise adjective such as "substantial" -- an adjective that would, in some cases, lead to criminal liability. Moreover, this is not a circumstance in which a jury could simply apply the ordinary, common sense definition of a broad term. Determining what "sufficient," "reasonable," or "substantial" mean in the context of the title insurance business is a highly technical enterprise, for which courts and juries require precise guidance.

Plaintiffs argue that any potential vagueness in the HUD ten-factor test is cured by the limited class of entities subject to its restrictions, because those entities would be able to request guidance from HUD. "[B]usinesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Hoffman Estates*, 455 U.S. at 498 (footnote omitted). The parties dispute whether HUD is willing to give informal opinions to prospective ABAs about the application of its ten-factor test. But even if HUD is willing to offer informal opinions, such guidance would only alleviate the first prong of the vagueness test -- whether the public has sufficient notice of what conduct is prohibited. The HUD test would still flunk the second prong -- whether the regulation gives authorities sufficient guidance to enforce the regulation in a non-arbitrary manner. As explained above, the statute gives

no guidance to courts or juries (both integral parts of the enforcement process) on applying its vague standards, and it confers extremely broad discretion on HUD and other enforcement agencies.[4]

In sum, HUD's interpretation of 12 U.S.C. § 2607 in Policy Statement 1996-2 is unconstitutionally vague. It provides insufficient guidance to the regulated public, and it lacks identifiable standards under which authorities (or private parties) can enforce its provisions in a criminal or civil context. Furthermore, HUD's Policy Statement is not "amenable to a limiting construction." *Skilling v. United States*, ---- S. Ct. ----, 2010 WL 2518587, at *26 (2010). Neither party has suggested a way to cure the Policy Statement's vagueness while still retaining its essential meaning. In addition, crafting a limiting construction here would be conceptually awkward, as the Policy Statement itself represents HUD's *construction* of the statute.

It is unnecessary for this Court to decide Defendants' alternative argument that the Policy Statement is not entitled to deference under *Chevron*. Accordingly, this Court has no comment on HUD's authority to develop and announce a more specific rule regarding sham entities. Importantly, RESPA's general prohibition on kickbacks remains in full force, as do the three requirements in Section 2607(c)(4)'s exception for ABAs. This Court's void-for-vagueness ruling reaches only the particular interpretation of RESPA advanced in Policy Statement 1996-2.

---

[4] Both the Ohio Department of Insurance ("ODI") and HUD have had the opportunity to weigh in on the conduct of WB Title and Integrity Title. ODI investigated both entities but found nothing improper (Kajfasz Decl., ¶¶ 20-22; Def. App'x, p. 206). HUD was given notice of these cases, including the constitutional challenge to Policy Statement 1996-2, but ultimately declined to participate (Doc. No. 139). Yet Defendants still face civil liability for alleged violations of RESPA. Regardless of what HUD or some other enforcement agency says (or does not say) in a particular case, the regulation must give courts and juries meaningful guidance.

*Application of the ABA Exception to These Cases*

Because the terms of HUD's Policy Statement cannot apply, this Court is left with the plain terms of the Section 2607(c)(4) exception for ABAs. The first question under a straightforward application of the statute is whether Defendants are ABAs, as defined by RESPA (12 U.S.C. § 2602(7)):

> (7) the term "affiliated business arrangement" means an arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider . . . [.]

There is no dispute that WB Title and Integrity Title did provide at least some "settlement services" -- namely, they evaluated the title evidence to determine insurability, issued title commitments, and issued final title insurance policies. *See* 12 U.S.C. § 2602(3) (defining "settlement services" to include, among other things, "title searches, title examinations, the provision of title certificates, [and] title insurance"). Thus, under the plain terms of the ABA definition, WB Title and Integrity Title are "providers of settlement services."

The next question is whether the ABAs complied with the three requirements of Section 2607(c)(4): (1) disclosure of the ownership arrangement; (2) no requirement for the consumer to use a particular provider; and (3) the only thing of value received by the ABA parents was their ownership interest in the provider. There is no dispute that all three requirements were met in this case. First, Plaintiffs were provided with disclosures of Defendants' ownership arrangement on forms promulgated by HUD (Carter Dep., p. 89; Def. App'x, p. 92). Second, Plaintiffs were not required to use any particular title insurance agency (Carter Dep., p. 90, Def. App'x, p. 92). Finally, the only

13

thing of value that the owners of WB Title and Integrity Title received was a return on their ownership interest (Kost Decl., ¶ 25; Nosker Decl., ¶ 23).[5]

## CONCLUSION

In sum, under the plain terms of RESPA, WB Title and Integrity Title are providers of settlement services, and there is no dispute they meet the three requirements of the Section 2607(c)(4) exception for ABAs. Therefore, Defendants have not violated the anti-kickback or unearned fee provisions of RESPA. Defendants' Motions for Summary Judgment (Case No. 05-CV-7427, Doc. No. 119; Case No. 09-CV-400, Doc. No. 52) are granted.

IT IS SO ORDERED.

        s/ *Jack Zouhary*
        JACK ZOUHARY
        U. S. DISTRICT JUDGE

June 30, 2010

---

[5] Chicago Title, a part owner of both WB Title and Integrity Title, also received a fee for an underwriter's portion of the title insurance premiums. RESPA specifically exempts the split of a title insurance premium between an agent and its underwriter, 12 U.S.C. § 2607(c)(1)(B), so such a payment would not deprive Defendants of the ABA exemption. *See* 12 U.S.C. § 2607(c)(4)(C) (allowing other "payments permitted under this subsection [2607(c)]"). Plaintiffs do not argue to the contrary.